**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| A.P., a minor, by and through his parent and next friend, JESSICA MARTIN, and JESSICA MARTIN, individually,<br><br>Plaintiffs,<br><br>vs.<br><br>CHARLOTTE-MECKLENBURG BOARD of EDUCATION d/b/a CHARLOTTE-MECKLENBURG SCHOOLS,<br><br>Defendant. | Case No.:<br><br>**COMPLAINT**<br>***Jury Trial Demanded*** |

## NATURE OF THE ACTION

1. This civil action is brought by A.P., by and through his mother, Jessica Martin, to require the Charlotte-Mecklenburg Board of Education to compensate him for injuries, damages, and violations of his legal and civil rights.

## PARTIES

2. Plaintiffs, A.P. and his mother, Jessica Martin, are residents of Mecklenburg County, North Carolina.

3. A.P. is a minor child with disabilities.

4. Defendant Charlotte-Mecklenburg Board of Education ("CMS") is a municipal corporation with the capacity to sue and be sued, charged by law with the governance, supervision, and control of the public school system within Mecklenburg County, commonly known as Charlotte-Mecklenburg Schools.

## JURISDICTION AND VENUE

5. This complaint, in part, arises under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131 – 12134, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

6. This Court has subject matter jurisdiction over the federal law claims pursuant to 28 U.S.C. § 1331.

7. This Court may exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

8. Venue in this district is proper under 28 U.S.C. § 1391(b) because Plaintiffs reside in this judicial district and Defendant is a public school district whose administrative offices are located in this judicial district.

## FACTUAL ALLEGATIONS

### I. A.P.'s Disabilities

9. During all times relevant to this action, A.P. has been diagnosed with Generalized Anxiety Disorder; Mixed Obsessional Thoughts and Acts; Attention-Deficit/Hyperactivity Disorder, Inattentive Type; Adjustment Disorder with Anxiety; and Asthma.

10. A.P. has also been assessed for and exhibits autistic traits and has a documented history of, among other things, a tic disorder, staring spells, and psychogenic non-epileptic seizures related to stress and anxiety.

11. Due to his disabilities, A.P. experiences a range of symptoms, including emotional dysregulation, a low-frustration tolerance, impulsivity, distractibility, difficulty understanding social norms, and irritability.

12. A.P.'s disabilities impact him academically, behaviorally, and socially. A.P. struggles with completing his assignments, following instructions, time management, maintaining attention, and regulating his emotions.

13. Although A.P. has above-average receptive and expressive language skills, he has low-average pragmatic language skills and significant difficulty with social engagement and interaction, including initiating and sustaining conversations, interpreting nonverbal cues, and applying his pragmatic knowledge with peers and adults across settings.

14. As a result, A.P. has notable difficulty establishing and maintaining relationships and communicating his thoughts, ideas, wants, and needs.

15. A.P. faces an increased risk for being bullied due to difficulty with peer relationships and social skills.

## II. A.P.'s Early Experience of Disability-Based Bullying at CMS (2021–2023)

16. A.P. first enrolled in Davidson K-8 School ("Davidson") in CMS for kindergarten in the 2017–2018 school year.

17. During the 2020–2021 school year, when A.P. was in third grade, Martin requested that CMS evaluate A.P. to determine if he was eligible for services under Section 504 of the Rehabilitation Act of 1973 ("Section 504"). Notably, Martin also requested that A.P. be evaluated when he was in the first grade.

18. Section 504 is a federal civil rights law that prohibits discrimination against individuals with disabilities in federally funded education programs or activities, and guarantees equal access to education for such individuals.

19. As relevant here, if an individual has a qualifying disability under Section 504 and is enrolled in the K-12 public school setting, the school is required to provide the individual with

a free appropriate public education ("FAPE"), usually by implementing a Section 504 Plan detailing the specific accommodations, modifications, and support services a student needs to access the general education curriculum.

20. In May 2021, Davidson's Section 504 Team determined that A.P. was eligible for Section 504 services.

21. CMS created a Section 504 Plan that included accommodations for extra time on assignments, social-emotional regulation opportunities, and chunking of writing assignments.

22. Despite A.P.'s Section 504 Plan, his challenges persisted and worsened during the following school years.

23. A.P. experienced increased difficulty with peer interactions and was bullied by peers.

24. Martin first reported her concerns to CMS that A.P. was experiencing bullying from peers due to his disabilities in May 2022, when Martin informed CMS that A.P. was afraid of going to school.

25. Despite Martin's report, CMS failed to take any corrective or preventative action during the 2021–2022 school year to investigate or address the bullying A.P. experienced.

26. Martin again reported her concerns about bullying in October 2022, noting that the bullying was negatively impacting A.P.'s education.

27. Still, CMS did not take corrective or preventative action to investigate or address Martin's concerns.

28. In an effort to enhance A.P.'s ability to access education, Martin repeatedly proposed that CMS consider implementing a number of accommodations in A.P.'s Section 504

Plan, including using direct and precise language when communicating with A.P. or allowing A.P. access to an isolated or quiet room to complete assignments.

29. During the 2022–2023 school year, CMS did not implement these suggestions or even convene a meeting to discuss revising A.P.'s Section 504 Plan in light of Martin's complaints about bullying or requests for additional accommodations.

30. Martin home-schooled A.P. for the majority of the 2023–2024 school year.

## III. A.P.'s 2024–2025 School Year: CMS Fails to Accommodate and Protect A.P.

31. A.P. returned to Davidson for the 2024–2025 school year as a seventh-grade student.

32. Despite Martin's repeated efforts to get CMS to provide A.P. with sufficient accommodations to allow him to access education, CMS failed to provide an adequate educational environment for A.P. Rather, it stood idly by while A.P.'s peers, and even one of his teachers, subjected A.P. to relentless bullying.

33. Prior to the beginning of the school year, Martin contacted Davidson's principal, Amanda Childress, to inform her about A.P.'s needs and to request that the school implement his Section 504 Plan beginning on the first day of school and evaluate A.P. for special education services immediately.

34. Despite this and many subsequent efforts from Martin, including providing copies of A.P.'s most recent Section 504 Plan and letters from his medical providers to his teachers, CMS did not take the necessary steps to support A.P. This included a failure to implement an individualized education program ("IEP") or his Section 504 Plan, as well as refraining from meeting to assess A.P.'s Section 504 Plan until three weeks after the start of the school year.

### A. <u>CMS's Deliberate Indifference to Reports of Bullying</u>

35. Beginning on the first day of school on August 26, 2024, A.P. experienced bullying from his peers.

36. Students made disparaging comments about A.P.'s disabilities and behaviors related to his disabilities, wrote demeaning messages about A.P. on the classroom board, and made false complaints about A.P.

37. Instead of investigating and addressing the students' bullying behaviors, A.P.'S teachers and the CMS administration disciplined A.P. and investigated the false complaints made against him.

38. For instance, on the first day of school his math teacher gave A.P. an assignment without setting clear expectations or manageable formatting, necessary and required accommodations as indicated in A.P.'s Section 504 Plan. This caused A.P. to become overly anxious and begin chewing on paper.

39. Instead of seeing A.P.'s behavior as a sign of distress warranting appropriate intervention based on his needs and Section 504 Plan, his teacher told him to stop chewing paper, causing the other students to begin staring at and mocking A.P.

40. The following day, A.P. again became agitated in response to his peers' cruel bullying. Consequently, the teacher scolded A.P. for his behavior and called in the school's Dean to intervene, further embarrassing A.P. in front of his classmates.

41. The day after this happened, another student wrote, "Don't eat paper" on the front classroom board during a class activity in A.P.'s computer sciences class, and the teacher did not erase the message nor address the bullying behavior.

42. A.P. became visibly upset and uncomfortable, confronting his classmates about who had written the message; in response, the teacher reprimanded A.P. and contacted the school administration.

43. Martin complained to school officials about these incidents of bullying and the failures of A.P.'s teachers to appropriately respond, yet CMS conducted no investigation and took no corrective or preventative actions.

44. Instead, Martin learned that CMS had *investigated A.P.*, as students had made false complaints that A.P. had behaved in a threatening manner. As a result of the students' false allegations, CMS notified the local police department, which conducted a safety check at A.P.'s home that evening. The police determined that A.P. did not present a safety threat and that the allegations against A.P. were not credible.

45. The police notified CMS of its findings by e-mail and indicated that A.P. was being bullied.

46. Principal Childress read the e-mail from the police in front of Martin.

47. Principal Childress then claimed she had to conduct an internal investigation, which led to her pulling A.P. from class in front of his classmates, and sending him home. This only exacerbated bias against A.P. within the CMS community.

48. Martin requested that Principal Childress quell the bias-derived fears of CMS parents via a statement in a weekly e-mail she sends. However, Principal Childress explained that her "higher-ups" would not allow her to do so.

49. Martin then requested that Principal Childress just announce that A.P. did not pose a credible threat, but no such announcement was made.

50. Dillon Widder, Davidson's Dean for the middle school, provided Martin with a "threat assessment form" detailing the claims against A.P. Notably, the incidents listed were all either false or were instances in which A.P. had become upset in response to disability-based bullying from other students.

51. Martin reported her concerns that the threat assessment was the result of discriminatory bullying from other students, but CMS failed to take any action against the other students.

**B. <u>CMS's Failure to Implement A.P.'s Section 504 Plan</u>**

52. On September 16, 2024, A.P.'s Section 504 Team met to conduct a re-evaluation and create an updated Section 504 Plan.

53. During the meeting, when A.P.'s science teacher could not remember something, she claimed she "has a little ADHD, don't we all" and laughed.

54. However, the Section 504 Team did not review or discuss A.P.'s bullying reports or how bullying affected his access to a FAPE.

55. The Section 504 Team nevertheless received information showing that A.P. had increased and changed needs.

56. A.P.'s teachers reported that he struggled with following instructions, starting tasks, completing work, actively participating, accepting assistance, regulating emotions, and speaking respectfully, although his math teacher reported that A.P.'s behavior improved when an extra adult was present to assist.

57. Although the Section 504 Team determined that A.P. remained eligible for Section 504 services, they merely adopted A.P.'s old Section 504 Plan without revising any of

the accommodations or assessing the need for additional support to ensure A.P. had access to a FAPE.

58. Martin presented a list of accommodations she believed could benefit A.P., which the Section 504 Team ignored.

59. Despite the adoption of the previous Section 504 Plan, CMS did not take actions needed to provide A.P. the accommodations he needed to access a FAPE.

60. Over the next month, CMS called Martin almost every day to report concerns about A.P.'s behavior.

61. On October 9, 2024, A.P. received a disciplinary referral for inappropriate language after an incident in art class.

62. During that incident, his art teacher, Emily Every-Carlson, aggressively confronted A.P. in an effort to redirect his behavior, in response to which A.P. walked off campus.

63. A.P. continued to struggle to complete assignments, turn in work on time, and participate in classes.

64. Ms. Every-Carlson reported to Martin that A.P. shut down when she attempted to speak with him about his work, and that A.P. was failing to complete assignments.

65. Ms. Every-Carlson recognized that A.P. appeared stressed and did not seem safe and comfortable under his current accommodations.

66. Despite this recognition, neither Ms. Every-Carlson nor CMS took action to provide A.P. additional accommodations in art class.

67. Martin also reported concerns to the Section 504 Team about A.P.'s writing and math abilities, noting that he needed different accommodations in order for him to learn; no action was taken.

68. A.P. began making up excuses to avoid math class, prompting Martin to contact CMS officials to inquire what was happening in A.P.'s math class and what could be done to ensure A.P. could catch up.

69. Instead of addressing the environment in math class or revising A.P.'s Section 504 Plan, CMS suggested that A.P. unenroll from honors math and take basic math or an online course.

70. On October 14, 2024, A.P.'s Section 504 Team met in response to Martin's request to correct information in the September 16 re-evaluation.

71. The Section 504 Team reviewed additional teacher input reporting that A.P.'s performance was poor and below average compared to his peers, and that he was becoming more combative and was not responding to their attempts to redirect his behavior.

72. One teacher noted that A.P. had become more withdrawn from peers, refused to sit by peers, and refused to complete group work.

73. Despite that new information, the Section 504 Team made no changes to A.P.'s Section 504 Plan.

74. Because CMS refused to provide additional accommodations or redress Martin's complaints about bullying, A.P. continued to struggle in class and in interactions with his peers.

75. On October 22, 2024, a group of students threw rocks at A.P. during recess, causing A.P.'s head to bleed profusely.

76. When Martin reported the incident and asked CMS to investigate, she was simply told that the cameras had not been working on the day of the incident, so the school would take no further action.

77. After the October 22 incident, A.P.'s academic, behavioral, and social difficulties escalated, and CMS continued to call Martin almost every day to report new concerns.

### C. <u>Harassment by Ms. Every-Carlson and CMS's Failure to Respond</u>

78. On November 7, 2024, the school nurse informed Martin that A.P. had ingested part of a pencil during art class because he felt stressed.

79. On November 8, 2024, A.P. received a 10-day suspension for alleged assault on school personnel.

80. The suspension notice stated that A.P. was not listening to Ms. Every-Carlson in art class and walked into Ms. Every-Carlson, shoving her on purpose.

81. However, A.P. did not shove Ms. Every-Carlson intentionally.

82. Rather, A.P. accidentally bumped into Ms. Every-Carlson, who was blocking his path with arms akimbo, when he was returning to his seat after Ms. Every-Carlson had publicly confronted him and harshly demanded that he return to his seat.

83. Ms. Every-Carlson's conduct was inconsistent with A.P.'s Section 504 Plan.

84. Ms. Every-Carlson herself later acknowledged that she should have stopped engaging with A.P. and waited for him to calm down instead of demanding that he return to his seat.

85. Ms. Every-Carlson was not injured.

86. CMS removed A.P. from class and suspended him for 10 days without first conducting a manifestation determination review, meaning a review to determine whether the alleged instance of misconduct was a result of his disabilities.

87. CMS did not immediately convene a Section 504 meeting to discuss revising A.P.'s accommodations or adding a Behavior Intervention Plan in response to the incident.

88. On November 8, 2024, Martin sent an e-mail complaining about the manner in which Ms. Every-Carlson had treated A.P. and CMS's response to the incident.

89. On information and belief, Joseph Scott Russell, the school resource officer immediately encouraged and assisted Ms. Every-Carlson in filing a police report to pursue a juvenile petition against A.P. The report was filed on November 12, 2024.

90. Officer Russell also threatened that if Martin did not put A.P. in the Charlotte-Mecklenburg Police Department Youth Diversion Program, that he would be forced to move forward with the juvenile charges.

91. Intimidation by the school resource officer and efforts by Ms. Every-Carlson caused A.P. to feel unsafe and targeted at school by both peers and adults.

92. Martin appealed A.P.'s suspension, arguing that CMS's disciplinary practices did not accommodate A.P.'s needs, and would hinder his academic process.

93. Principal Childress denied the appeal.

94. During A.P.'s suspension, he did not receive Section 504 services and could not access a FAPE.

95. Although Martin had requested assistance in ensuring that A.P. could access online work or physical copies of the assignments, no assistance was provided.

96. On November 22, 2024, A.P.'s Section 504 Team conducted a manifestation determination review for the November 8 incident, and determined that A.P.'s conduct was caused by and related to his disabilities.

97. At the November 22 meeting, Martin reported concerns about A.P.'s unmet behavioral and social needs and missing instructional time, and that teachers were failing to implement A.P.'s Section 504 Plan.

98. Despite those concerns and A.P.'s increased disciplinary incidents, CMS did not revise A.P.'s Section 504 Plan or implement a Behavior Intervention Plan.

99. A.P. returned to school on November 25, 2024, and was removed from math class that day and the following day because he supposedly made other students "uncomfortable."

100. During A.P.'s removal from math on November 25 and November 26, he did not receive his Section 504 services.

101. In response to A.P.'s removal from math class, Martin explained to Principal Childress that other students were making fun of A.P. daily, such that he did not feel comfortable or safe in class.

102. Principal Childress did not initiate a bullying investigation, convene a Section 504 meeting to discuss the impact of bullying on A.P.'s access to a FAPE, or take any other action in response to Martin's complaint.

**D. <u>CMS's Discriminatory Discipline of A.P.</u>**

103. On December 16, 2024, Martin scheduled an appointment with Principal Childress to file an internal grievance against Ms. Every-Carlson, as Officer Russell indicated that Ms. Every-Carlson was in the process of pursuing charges against A.P. The Division of

Juvenile Justice and Delinquency Prevention ultimately closed the case in April 2025 with no further action taken.

104. Martin also complained about CMS's failure to respond to her earlier reports of disability-based bullying.

105. Later that day, on December 16, 2024, one of the peers who had previously thrown a rock at A.P. threw a glue cap at A.P.'s head during math class. A.P. got out of his seat and asked who threw the glue cap.

106. Kaile Rizzo, CMS teacher, witnessed the incident but did not address the peer's conduct or report it as bullying. Rather, she reprimanded A.P. for being out of his seat.

107. On December 18, 2024, A.P. was again bullied at recess, when a peer called him "fat," causing A.P. to get upset.

108. Rather than address the peer who had insulted A.P., CMS staff yelled at A.P., striking him with fear. The staff then imposed a two-day in-school suspension on A.P.

109. The suspension notice acknowledged that CMS had received allegations that A.P. was experiencing bullying and claimed CMS was investigating the allegations.

110. In response to the suspension, Martin again reported her concerns that bullying from peers and CMS's failure to address it was denying A.P. access to an education and causing him great distress. She again requested that the school implement different accommodations to allow A.P. to access a FAPE.

111. CMS still did not convene a Section 504 meeting to address A.P.'s access to a FAPE or revise his accommodations.

112. On December 20, 2024, A.P.'s IEP Team found him eligible for special education services under the categories of Emotional Disability and Other Health Impairment.

### E. <u>CMS's Failure to Implement A.P.'s IEP</u>

113. On January 3, 2025, A.P.'s IEP Team met to develop an IEP.

114. The IEP Team adopted A.P.'s Section 504 accommodations from September 16, 2024, without taking into account the issues A.P. had faced in the intervening months.

115. At the IEP meeting on January 3, 2025, Martin expressed concern that A.P. had not received a FAPE that school year due to disability-based bullying and that the Section 504 Plan had not sufficiently addressed A.P.'s needs in response to the bullying incidents.

116. In response, the IEP Team stated that neither the IEP Team nor the previous Section 504 Team was required to address bullying allegations.

117. On January 14, 2025, a CMS official responsible for addressing bullying provided a Bullying Safety Plan for A.P.

118. However, the Bullying Safety Plan did not seek to remedy past bullying, and it did not physically separate A.P. from students who bullied him or seek to restore those relationships.

119. Rather, the Bullying Safety Plan primarily provided for monitoring A.P.'s interactions with students and ways for A.P. to report future concerns.

120. CMS failed to monitor these peer interactions despite the Bullying Safety Plan, and A.P. continued to experience disability-based bullying.

121. On January 29, 2025, during a hallway transition, Ms. Every-Carlson opened a stairway door that struck A.P.'s body.

122. Martin complained to CMS officials that she believed Ms. Every-Carlson's conduct was intentionally targeted at A.P., as Martin had filed an internal grievance against her, and constituted bullying contributing to a hostile environment.

123. Martin requested a safety plan to ensure that A.P. and Ms. Every-Carlson did not interact with one another.

124. CMS denied that request.

125. On February 3, 2025, Martin submitted another formal complaint against Ms. Every-Carlson to the school, in which she stated that, as a result of the hostile environment created by bullying and perpetuated by the January 29 incident, A.P. was suffering constant anxiety attacks and becoming physically sick.

126. CMS failed to take any action to protect A.P. from further bullying or retaliation from Ms. Every-Carlson.

127. CMS also failed to implement A.P.'s IEP for a majority of the remainder of the school year, causing A.P. to fall far behind his peers in school.

128. A.P. continued to experience disability-based bullying from peers, which went unaddressed by CMS.

129. On February 21, 2025, Martin and A.P. filed a complaint against CMS with the United States Department of Education Office for Civil Rights ("OCR"), asserting claims for violation of Section 504 and the ADA.

130. A few days later, on February 26, 2025, CMS suspended A.P. for five days when A.P. became upset when other students hit him in the head with gumballs and insulted him. Again, CMS disciplined A.P. but not the students who bullied him.

131. CMS suspended A.P. two more times during the remainder of the 2024–2025 school year.

132. Despite Martin's repeated requests that CMS adjust A.P.'s accommodations to help him improve his behavior and his access to education, CMS did not materially change his IEP.

## IV. <u>A.P.'s 2025–2026 School Year: A.P. Asserts His Rights, and CMS Retaliates</u>

133. Given CMS's failure to address A.P.'s needs during the 2024–2025 school year, overcrowding, and other factors, A.P. transferred to a charter school for the first semester of the 2025–2026 school year.

134. However, A.P. returned to CMS, enrolling in Bailey Middle School ("Bailey"), in January of 2026.

135. In preparation for A.P.'s return to CMS, Martin provided information from A.P.'s psychiatrist about his needs and the additional accommodations that could assist him.

136. Although CMS adopted an IEP for A.P., teachers and staff failed to comply with it and accommodate A.P.'s needs.

137. On February 24, 2026, Martin attended an OCR mediation to discuss potential resolution of their OCR complaint with CMS. Bailey's principal, Jason Bissinger, attended the mediation and listened while Martin spoke about CMS's failure to protect A.P. from bullying, failure to accommodate his disabilities, and failure to provide him a FAPE. Notably, Principal Bissinger participated in side-conversations during the meeting.

138. The very next day, February 25, 2026, in a blatant act of retaliation, Principal Bissinger caused A.P. to be suspended for three days.

139. That day, the school held a career fair, where members of the police department allowed students to play with their handcuffs. The students were handcuffed, including A.P., to see if they could escape.

140. When A.P. was handcuffed, he fell and injured himself, and then went to the nurse's office.

141. During the lunch hour, A.P. went into a classroom he was not supposed to be in and sat in the corner.

142. Principal Bissinger then came into the classroom, physically removed A.P., and took him to the Dean's office to be suspended for not leaving the classroom when the teacher told him to.

143. The Dean who wrote the suspension paperwork noted that A.P. "looked lost that day."

144. Subsequently, A.P. was removed entirely from that teacher's class, which altered his entire schedule.

145. During this suspension, A.P. was not provided a FAPE.

146. Principal Bissinger claimed that all of A.P.'s assignments would be on the school's online platform, Canvas, for A.P. to access during the suspension. However, the assignments were not accessible during that time.

147. Martin appealed the suspension to Principal Bissinger on February 26, 2026, and to the Assistant Director and Executive Director of CMS middle schools on February 28, 2026. Martin never received a substantive response to her appeals.

148. No one had informed A.P. or Martin that the career fair would be happening, let alone that A.P. would be handcuffed. This amounted to a blatant disregard for A.P.'s needs and well-being.

149. On March 2, 2026, CMS determined that A.P.'s behavior on February 25, 2026, was a manifestation of his disabilities, and that he should not have been disciplined for it.

150. After the traumatic experience at the career fair and the ensuing retaliatory suspension, A.P. became completely withdrawn and refused to engage at school.

151. Martin repeatedly asked for assistance in getting A.P. the help he needed to continue his education. Although A.P was placed on a modified class schedule as recommended by A.P.'s medical provider, none of the other recommended changes were made to A.P.'s IEP.

## CAUSES OF ACTION

### COUNT I
### Discrimination in Violation of Title II of the ADA, 42 U.S.C. § 12132

152. Plaintiffs incorporate Paragraphs 1-151 of the Complaint as if fully stated herein.

153. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

154. At all relevant times, A.P. was a qualified individual with a disability.

155. A.P. was otherwise qualified to participate in and receive the benefits of CMS's educational programs and activities.

156. CMS is a department, agency, or other instrumentality of a state or local government, and thus is a "public entity" within the meaning of the ADA.

157. CMS discriminated against A.P. on the basis of his disabilities by, among other things:

a. Failing to provide A.P. the accommodations and services necessary to afford him meaningful access to his education, including by repeatedly adopting outdated Section 504 accommodations without revision despite documented changes in his needs;

b. failing to implement A.P.'s Section 504 Plan and IEP consistently, including by failing to provide teachers and staff copies of his plan or the training needed to implement his plan;

c. subjecting A.P. to disproportionate and exclusionary discipline for conduct that was a manifestation of his disabilities, including suspensions imposed without the procedural protections owed to students with disabilities; and

d. failing to investigate and respond to pervasive disability-based bullying that created a hostile educational environment and denied A.P. meaningful access to his education.

158. CMS knew of the violations of A.P.'s federally protected rights, yet failed to act, thereby exhibiting deliberate indifference to A.P.'s rights.

159. As a direct and proximate result of CMS's discrimination, A.P. was denied meaningful access to his education and suffered academic, psychological, and physical harm.

160. As a direct and proximate result of CMS's conduct, Plaintiffs have suffered damages including, but not limited to, lost educational opportunity, emotional distress, out-of-pocket expenses, and lost wages incurred by Martin.

**COUNT II**
**Discrimination in Violation of Section 504 of the Rehabilitation Act,**
**29 U.S.C. § 794 *et seq.***

161. Plaintiffs incorporate Paragraphs 1-160 of the Complaint as if fully stated herein.

162. At all relevant times, A.P. was a "handicapped person" as defined by the regulations implementing Section 504. 34 C.F.R. § 104.3(j)(1), (l)(2).

163. CMS is a recipient of federal financial assistance from the Department of Education that operates a program or activity as defined by the regulations implementing Section 504. 34 C.F.R. § 104.3(f), (k).

164. CMS discriminated against A.P. by excluding him from participation in a federally-funded program and denying him the benefits of that program solely on the basis of his disability.

165. CMS failed to provide A.P. with a FAPE and reasonable accommodations due to his disability-related behaviors and failed to provide A.P. an appropriate education that was

designed to meet his individual educational needs as adequately as the needs of nonhandicapped persons are met.

166. As a direct and proximate result of CMS's discrimination, A.P. did not develop appropriate academic, social, behavioral, and communication skills, and has regressed academically, behaviorally, and socially.

167. As a direct and proximate result of CMS's conduct, Plaintiffs have suffered damages including, but not limited to, lost educational opportunity, emotional distress, out-of-pocket expenses, and lost wages incurred by Martin.

**COUNT III**
**Retaliation under Section 504 and Title II,**
**42 U.S.C. § 12203**

168. Plaintiffs incorporate Paragraphs 1-167 of the Complaint as if fully stated herein.

169. The ADA prohibits retaliation against any individual who has opposed an act or practice made unlawful by the ADA or who has made a charge or participated in a proceeding under the ADA, and prohibits coercion, intimidation, threats, and interference with any individual in the exercise or enjoyment of any right protected under the ADA. 42 U.S.C. § 12203(a), (b).

170. The Department of Education's Section 504 regulations prohibit public school districts that receive federal funding or any other person from intimidating, threatening, coercing, or discriminating against any individual for the purpose of interfering with their Section 504 rights, or because such person has made a complaint, testified, assisted, or participated in a proceeding under Section 504. 34 C.F.R. § 104.61 (incorporating procedural protections from 34 C.F.R. § 100.7(e)).

171. Plaintiffs engaged in protected activity by, *inter alia*: complaining to CMS about its failure to accommodate A.P.'s disabilities and its failure to investigate or correct a disability-

based hostile educational environment; filing internal grievances; filing a complaint with OCR; and participating in an OCR proceeding.

172. CMS was aware of Plaintiffs' protected activity.

173. Because of Plaintiffs' protected activity, CMS took materially adverse actions against A.P., including but not limited to suspending A.P. on multiple occasions, including immediately following the OCR mediation, and refusing to investigate or correct a hostile educational environment.

174. As a direct and proximate result of CMS's retaliation, Plaintiffs suffered damages including lost educational opportunity, emotional distress, out-of-pocket costs, and lost wages incurred by Martin.

**COUNT IV**
**Negligence**

175. Plaintiffs incorporate Paragraphs 1-174 of the Complaint as if fully stated herein.

176. North Carolina common law prohibits parties owing duties of care from engaging in negligence.

177. Defendant negligently engaged in the conduct described herein, including failing to adequately supervise students and staff, failing to investigate and respond to repeated reports of physical and verbal bullying, failing to protect A.P. from the harmful conduct of teachers and staff, and failing to implement measures reasonably calculated to prevent foreseeable harm to A.P.

178. It was reasonably foreseeable that such conduct would cause A.P. physical injury, emotional harm, and educational loss, particularly given Defendant's knowledge of A.P.'s disabilities and Martin's repeated warnings that Defendant's conduct was causing A.P. significant harm.

179. Defendant's conduct in fact proximately caused A.P. physical injury, emotional harm, and educational loss.

180. Plaintiffs seek compensatory damages in an amount to be proven at trial, together with costs and such other relief as the Court deems just and proper.

**COUNT V**
**Negligent Infliction of Emotional Distress**

181. Plaintiffs incorporate Paragraphs 1-180 of the Complaint as if fully stated herein.

182. North Carolina common law prohibits the negligent infliction of emotional distress.

183. Defendant negligently engaged in the conduct described herein, including failing to protect A.P. from bullying, failing to provide A.P. the accommodations necessary for him to access education, and subjecting him to punitive and exclusionary treatment.

184. It was reasonably foreseeable that such conduct would cause A.P. severe emotional distress, particularly given CMS's knowledge of A.P.'s disabilities and Martin's repeated warnings that CMS's conduct was causing significant emotional and mental harm to A.P.

185. Defendant's conduct in-fact caused A.P. severe emotional distress.

186. Defendant's conduct was malicious, willful, and wanton, and done with conscious and intentional disregard of and indifference to the rights and safety of A.P.

187. Plaintiffs seek compensatory damages in an amount to be proven at trial, together with costs and such other relief as the Court deems just and proper.

**PRAYER FOR RELIEF**

NOW WHEREFORE, Plaintiffs respectfully request that:

1. Enter judgment against Defendant and in favor of Plaintiffs for discrimination and retaliation under the ADA, discrimination and retaliation under Section 504, negligence, and negligent infliction of emotional distress;

2. Award Plaintiffs compensatory damages, including for physical harm, emotional harm, educational loss, and lost income, in an amount to be proved at trial;

3. Award Plaintiffs attorneys' fees and costs, in an amount to be proved at trial; and

4. All other relief that the Court may deem just and proper.

Plaintiffs hereby demand a trial by jury.

Dated: August 27, 2026

Respectfully submitted,




Dana C. Lumsden, Esq.
[NC Bar No. 32497]
**SEYFARTH SHAW LLP**
300 South Tryon Street, Suite 400
Charlotte, North Carolina 28202
Telephone: (704) 925-6023
Facsimile: (704) 559-2425
dlumsden@seyfarth.com

Caitlin Whalan Jones, Esq.
[NC Bar No. 49606]
**CHARLOTTE CENTER FOR LEGAL ADVOCACY**
PO Box 25558
Charlotte, North Carolina 28229
Telephone: (980) 202-7314
Facsimile: (980) 202-7314
caitlinw@charlottelegaladvocacy.org

ATTORNEYS for the PLAINTIFF
A.P., a minor, and JESSICA MARTIN